**WILDFANG–MILLER MOTORS, INC.,**
**Plaintiff and Appellant,**

v.

**Arthur T. MILLER and Lucille Miller,**
**Defendants,**

and

**Don Dralle and Evelyn Dralle, Intervenors**
**and Respondents.**

**Civ. No. 8673.**

Supreme Court of North Dakota.

April 22, 1971.

582

Rausch & Chapman, Bismarck, for plaintiff-appellant.

Wolf & Glaser, Bismarck, for intervenors-respondents.

PAULSON, Judge.

This is an appeal and a demand for a trial de novo by Wildfang-Miller Motors, Inc., from a judgment entered on August 14, 1969, in the District Court of Burleigh County, North Dakota, in an action brought by Wildfang-Miller Motors, Inc. [hereinafter Wildfang-Miller], against the defendants Arthur T. Miller and Lucille Miller [hereinafter Millers] to establish a constructive trust in favor of Wildfang-Miller. Thereafter the Millers defaulted and, subsequently, the intervening defendants, Don Dralle and Evelyn Dralle [hereinafter Dralles], commenced proceedings for intervention and as cross-complainants. On June 19, 1969, the Millers conveyed the tract of land which is the subject of this action, and which is alleged to be owned by the Dralles, to Wildfang-Miller. The trial court held that a constructive trust existed in behalf of the Dralles, and the judgment directed a reconveyance of the land to the intervening Dralles, subject to a mortgage in the sum of $24,000 plus accrued interest thereon at the rate of 6 per cent per annum held by Wildfang-Miller. The facts in this case involve three-quarters of a section of land located and described as the north half and the southeast quarter of section 9, township 137 north, range 76, west of the fifth principal meridian, Burleigh County, North Dakota. Wildfang-Miller, during all of the times herein mentioned, has been and is in the automotive and farm implement business in Steele, Kidder County, North Dakota. In 1965, Arthur T. Miller was an officer and director of Wildfang-Miller. Don Dralle, a farmer, had known Mr. Miller since Mr. Miller's childhood. Because Mr. Miller was a businessman, Mr. Dralle had consulted him on numerous occasions with reference to financial matters. Mr. Dralle, since 1949, had been a customer of Wildfang-Miller's in business transactions which included sales of various farm equipment and machinery; and the furnishing of repairs, supplies, and labor, for which, by 1965, Mr. Dralle's indebtedness to Wildfang-Miller had accrued in the sum of $7,000. During this time, Mr. Dralle had a contract for the purchase of the land in question from Neil Edwards, another farmer. Mr. Edwards also carried a large account with Wildfang-Miller. Wildfang-Miller cleared the accounts of Mr. Dralle and Mr. Edwards by agreeing to advance money to pay off Mr. Edwards and to cancel his debt to Wildfang-Miller, and in return to receive a mortgage from the Dralles as security for the amount of Mr. Dralle's indebtedness. The mortgage covering the land involved was in the amount of $24,000 as of September 13, 1965. Further cash advances were made, subsequent to the execution of the mortgage, by Wildfang-Miller to Mr. Dralle. On December 29, 1965, Mr. and Mrs. Dralle executed a warranty deed conveying the land in question to Mr. and Mrs. Miller. Thereafter, Mr. and Mrs. Miller quitclaimed the property involved to Wildfang-Miller. During the pendency of this action, Mr. Ramon Wildfang, an officer of Wildfang-Miller, testified that the Dralle land was not worth any more than the $26,000 which Wildfang-Miller already had invested in it. However, Mr. Miller's and Mr. Dralle's estimates of the value of the land ranged from $70 to $90 per acre, which would place its value in excess of $26,000. In addition, Mr. Dralle had made improvements on the land since the execution of the mortgage and the deed, which included the breaking of 200 acres of prairie land. Mr. Dralle testified, with reference to his meeting with Mr. Miller and particularly with reference to the execution of the deed to the Millers:

"He came to my place and I think at the time he had advanced me approxi-

mately $1,000 for expenses, personal money, I understood personal expense money that I needed, and then at that time he said, 'Why don't you give me a deed for this land?' Well, it sort of caught me off guard, so-to-speak, and after thinking it over, he said, 'As a matter of good faith and for what I am doing for you.' I said, 'Well, I don't like to give a deed to the Windfangs [*sic*], or the Miller-Wildfang corporation, but if you insist I will give you—if you insist on a deed I will give that to you, Mr. Miller,' and he said, 'Well, we will make this deed to myself and my wife,' and I said, 'Well, now, how far-reaching is this deed going to be?' He said, 'Well, at such time as your finances get into such a condition they are somewhat more healthy than they appear to be now and I will probably be in a position to return this deed to you.' And he said, 'In no event—I will see to it personally that you and your wife never lose this land.' Upon that statement I felt safe in giving him the deed. His word had always been good prior to that time and I gave it to him without any fear at all of having any problems."

Mr. Miller denies that any discussion of a trust agreement was had between the Dralles and himself during this meeting. In March of 1969, a notice of foreclosure of the mortgage in behalf of Wildfang-Miller was served upon the Dralles.

▉ The issue in this case is whether or not the conveyance on December 27, 1965, from Don Dralle and Evelyn Dralle to Arthur T. Miller and Lucille Miller of the described property created a constructive trust in favor of the Dralles, with the Millers being the trustees thereof. The relevant North Dakota statutes are:

59-01-06, N.D.C.C. *"Implied trust—How created.*—An implied trust arises in the following cases:

"1. One who wrongfully detains a thing is an implied trustee thereof for the benefit of the owner;

"2. One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an implied trustee of the thing gained for the benefit of the person who would otherwise have had it;

"3. Each one to whom property is transferred in violation of a trust holds the same as an implied trustee under such trust, unless he purchased it in good faith and for a valuable consideration;

"4. When a transfer of real property is made to one person and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

59-01-08, N.D.C.C. *"One assuming relation of personal confidence is trustee.*—Everyone who voluntarily assumes a relation of personal confidence with another is deemed a trustee within the meaning of this chapter not only as to the person who reposes such confidence, but as to all persons of whose affairs he thus acquires information which was given to such person in the like confidence, or over whose affairs he, by such confidence, obtains any control."

The general rule concerning the creation of a constructive trust is expressed in 54 Am.Jur. Trusts § 225, at page 173:

"While a confidential or fiduciary relationship does not in itself give rise to a constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally to ground equitable relief in the form of the declaration and enforcement of a constructive trust, and the courts are careful not to limit the rule or the scope of its application by a narrow definition of fiduciary or confidential relationships protected by it. An abuse of

confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one."

Then, in § 226, at pages 173–174, it is stated:

"The abuse of a confidential relationship by acquiring property through the employment of knowledge or interest obtained in such relationship constitutes a sufficient basis for equitable relief in the form of the declaration and enforcement of a constructive trust in respect of such property and in favor of the person wronged. The relationships of trustee and cestui que trust, principal and agent, client and attorney, and employer and employee, are striking, but far from exclusive, examples of confidential relationships within the meaning of this rule."

And, in § 233, at pages 178–179, it is stated:

"A constructive trust arises where a conveyance is induced on the agreement of a fiduciary or confidant to hold in trust for a reconveyance or other purpose, where the fiduciary or confidential relationship is one upon which the grantor justifiably can and does rely and where the agreement is breached, since the breach of the agreement is an abuse of the confidence, and it is not necessary to establish such a trust to show fraud or intent not to perform the agreement when it was made. The tendency of the courts is to construe the term 'confidence' or 'confidential relationship' liberally in favor of the confider and against the confidant, for the purpose of raising a constructive trust on a violation or betrayal thereof."

This general rule has long been followed in North Dakota. In McDonald v. Miller, 73 N.D. 474, 16 N.W.2d 270, 271 (1944), in paragraphs 1, 3, and 4 of the syllabus, this court held:

"1. A constructive trust will be imposed by the courts in order to do equity and prevent unjust enrichment when title to property is acquired by fraud, duress, undue influence, or is acquired or retained in violation of a fiduciary duty.

"3. The existence of a constructive or resulting trust in real property may be established by parol evidence that is clear, convincing and satisfactory.

"4. Where it is sought to impose a constructive trust upon a conveyance of real estate the existence of a confidential relationship between the grantor and grantee is of major importance to be considered in connection with other facts and circumstances in the case."

In addition, this court, in Barker v. Barker, 75 N.D. 253, 27 N.W.2d 576, 577–578 (1947), in paragraphs 3, 5, and 7 of the syllabus, held:

"3. The law recognizes that a relationship known as a 'confidential relation' may exist between the parties to a transaction, where by reason of kinship or professional, business, social or family relations, 'confidence is naturally inspired or, in fact, reasonably exists.'

"5. A confidential relation is not confined to any specific association of parties but applies generally to all persons who are associated by any relation of trust and confidence. * * *

"7. Where a person obtains the legal title to property by such arts or acts or circumstances of circumvention, imposition, or fraud, or by virtue of a confidential relation and influence under such circumstances that he ought not, according to the rules of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interest of the property, courts of equity, in order to administer justice between the parties, will raise a trust by construction out of such circumstances or relations; and

this trust they will fasten upon the conscience of the offending party and will convert him into a trustee of the legal title, and order him to hold it or to execute the trust in such manner as to protect the rights of the defrauded party and promote the safety and interests of society."

*Cf.* Sprenger v. Sprenger, 146 N.W.2d 36 (N.D.1966); Mechtle v. Topp, 78 N.D. 789, 52 N.W.2d 842 (1952); Rovenko v. Bokovoy, 77 N.D. 740, 45 N.W.2d 492 (1950).

 It should be noted that, in addition to the above-cited case law, our statutes, §§ 59-01-06 and 59-01-08, N.D.C.C., indicate that fraud is only one of the bases upon which a trust can be predicated. Fraud need not be proved, since the existence of a personal confidence is deemed sufficient to create a trust. Evidence clearly established, in the case at bar, that Mr. Miller and Mr. Dralle had known each other for the entire lifetime of Mr. Miller. Mr. Miller had been an adviser in financial matters to Mr. Dralle during the past several years. This evidence was primarily established through oral testimony given by Mr. Miller and Mr. Dralle at the trial. This court has repeatedly held that when an appellant demands a trial de novo and a retrial of the entire case in an appeal from a judgment in an action tried to the court without a jury, the findings of the trial court shall be given appreciable weight by the Supreme Court, especially where such judgment is based upon the testimony of witnesses who appeared in person before the trial court. Koistinen v. Farmers Union Oil Co. of Rolla, 179 N.W.2d 327 (N.D.1970); Renner v. Murray, 136 N.W.2d 794 (N.D.1965); Goheen v. Gauvey, 122 N.W.2d 204 (N.D.1963); Strobel v. Strobel, 102 N.W.2d 4 (N.D.1960).

In addition to the evidence that the confidential relationship which existed between the Dralles and the Millers had been broken by Mr. Miller, there is ample evidence to indicate that Wildfang-Miller would be unjustly enriched, as both Mr. Miller and Mr. Dralle estimated the minimum value of the land involved at $70 per acre and the maximum value of the land at $90 per acre. The estimate of the minimum value of all of the land would then be $33,600, which is considerably in excess of the approximate $26,000 mortgage indebtedness. If the Dralles are in default, Wildfang-Miller has an adequate remedy at law in foreclosing the mortgage, and the Dralles' redemption rights would then be preserved. In addition, Wildfang-Miller has a remedy at law to recover the cash advances made to Mr. Dralle subsequent to the execution of the mortgage.

For the reasons stated in the opinion, the decision of the district court is affirmed.

STRUTZ, C. J., and KNUDSON, TEIGEN and ERICKSTAD, JJ., concur.